UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

STANLEY GENE DENHOF,

                        Plaintiff,                      Case No. 1:14-cv-495

v.                                            Honorable Janet T. Neff

STATE OF MICHIGAN et al.,

                        Defendants.

_____/

## OPINION

        This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. The Court has granted Plaintiff leave to proceed *in forma pauperis*. Under the Prison Litigation Reform Act, PUB. L. NO. 104-134, 110 STAT. 1321 (1996), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint on grounds of immunity and for failure to state a claim.

**Discussion**

I.     Factual allegations

Plaintiff Stanley Gene Denhof presently is incarcerated with the Michigan Department of Corrections (MDOC) at the Muskegon Correctional Facility (MCF), though the actions about which he complains also occurred while he was housed at the Carson City Correctional Facility (DRF) and the Michigan Reformatory (RMI).  Plaintiff sues the State of Michigan, the MDOC, MDOC Director Daniel Heyns, and the following prison employees:  RMI Warden Carmen Palmer; RMI Deputy Warden Timothy Kipp; RMI Administrative Assistant Scott Yokum; RMI Inspector Harvey Dutcher; RMI Lieutenant John Sutton; DRF Warden Willie Smith; DRF Inspector (unknown) Christiansen; MCF Warden Sherry Burt; MCF Deputy Warden Shane Jackson; MCF Captain Steven Pettit; MCF Secretary to the Warden Kathy Jeffries; Resident Unit Manager (RUM) Jeanine Winger; MCF Librarian Elisia Hardiman; MCF Classification Director Julie Mack; and MCF Grievance Coordinator Lashae Simmons.

Plaintiff broadly alleges that the three prisons at which he was incarcerated between December 12, 2011 and the present deprived him of his rights under the First, Eighth and Fourteenth Amendments.  In his first set of allegations, Plaintiff contends that the RMI Defendants imposed the following harsh prison conditions upon him:  using shackles during cell extractions; placing Plaintiff in protective custody but housing him in segregation with violent offenders; labeling his cell with a card designating that he was in protective custody, suggesting to anyone who came into the area that Plaintiff was a snitch; failing to meet his basic hygiene and healthcare needs; and fabricating stories.

More specifically, on December 12, 2011, while he was housed at RMI, Plaintiff wrote a letter to Defendant Heyns, apparently complaining about his conditions of confinement and fear of other prisoners. On December 15, 2011, Plaintiff's door was not opened for lunch. Officers came into his cell, placed him in handcuffs and shackles, and took him to the segregation unit used for violent prisoners. His placement in segregation prevented him from having a contact visit with his family that day. Defendants Yokum and Dutcher met with Plaintiff's family when they arrived for their scheduled visit, telling them that Plaintiff was in segregation for writing the letter to Defendant Heyns and falsifying documents. Plaintiff's sister left the facility and immediately called Defendant Heyns to tell him about the allegedly retaliatory action taken against Plaintiff.

At approximately 4:00 p.m. that afternoon, Plaintiff was placed in handcuffs, chains and shackles and escorted to Defendant Dutcher's office. Defendant Dutcher interviewed Plaintiff about his letter to Defendant Heyns, asking if Plaintiff wanted protection. Plaintiff does not indicate his response to Dutcher's question. He merely complains that he had sent letters on January 2, 2009 and earlier in 2011, reporting threats, attempted assaults and theft, yet he had not been given protected status. Plaintiff alleges that Defendant Dutcher accused Plaintiff's sister of forgery, causing Plaintiff to be fearful that his sister would endure false imprisonment like Plaintiff himself. Dutcher offered Plaintiff the use of the telephone and asked Plaintiff to call his sister to calm her down. Plaintiff's sister told Plaintiff that Defendant Yokum had lied to her during her meeting with Yokum and Dutcher, apparently by telling her something different than what Dutcher told Plaintiff. At the end of the interview, Dutcher told Plaintiff that, if he needed to make another call or needed to talk to Dutcher, he should just ask, and it would be allowed.

When Plaintiff arrived back in the segregation area, he noticed that all other segregation prisoners had a white card outside their doors.  In contrast, Plaintiff had a blue card outside his cell door, saying "Prot." (Compl. ¶ 42, docket #1, Page ID#16.)  Plaintiff claims that the different card communicated to the other prisoners in the unit that Plaintiff was a "snitch."  (*Id.*)  Plaintiff asked the on-duty correctional officer if he could use the telephone, but his request was denied.  Petitioner received a portion of his property, such as clothing, sheets, towels, and some books, but he received no personal hygiene items.  His request for both hygiene items and writing implements was denied.

On December 16, 2011, Plaintiff was visited by family.  Instead of having up to six hours of contact visitation, Plaintiff was shackled and handcuffed, and he could only speak with his family from behind glass and through a phone for a limited period of time.  The waist-shackles made it painful to hold the phone.  He also could not have any food, water or drink during his non-contact visit.  Plaintiff told his family that he did not have a toothbrush, toothpaste, deodorant or shampoo, nor did he have a cup to drink from.  Plaintiff's family complained to Defendant Heyns' office on numerous occasions.  Plaintiff was again denied hygiene items and a phone call.  Because of the blue card on his cell, other prisoners in segregation began to yell that Plaintiff was a snitch and an informant, and they harassed and demeaned Plaintiff.  Plaintiff was told by unknown correctional officers working in segregation that "this is what happens to snitches and that he shouldn't have written t[o] 'Lansing' about the officers."  (*Id.* ¶ 53, Page ID#9.)

On December 17 and 18, 2011, Plaintiff again was denied the opportunity to use the telephone.  On December 18, Plaintiff asked to speak with the shift commander.  Defendant Lt. Sutton came to Plaintiff's cell, but refused to allow Plaintiff to speak with him in private.  Sutton

gave Plaintiff a pen and paper, on which he was asked to write down the problem.  Plaintiff complained about the verbal abuse, the denial of phone calls, and the lack of psychiatric medical providers.  Sutton told Plaintiff that everyone in segregation had problems, that no psychiatric worker was available, and that Plaintiff could not use the phone.  Plaintiff again asked to see Dutcher, but his requests were denied.  Plaintiff received another no-contact visit with his sister, to which he was taken in handcuffs and shackles.  As he was returning to his cell, he asked the correctional officer for personal hygiene products.  He was provided some tooth powder, but nothing else.

Later that afternoon, Plaintiff was transferred to another section of the facility, which was used for segregation of inmates for protection purposes.  According to Plaintiff the verbal abuse and harassment stopped, but he still did not receive his personal property.  In addition, Plaintiff alleges that the protection unit had openings for days preceding his transfer, demonstrating that his original segregation placement was retaliatory and designed to inflict physical and emotional distress.  Further, Plaintiff complains that correctional officials did not notify him that he now would be able to use the phone.  Plaintiff's family called and left a message for the prison administration to deliver a care-pack to Plaintiff, which he did not receive.  Plaintiff also did not receive his personal property, despite having been told by Sutton that he could have it.  Also, although a correctional officer gave Plaintiff a small pencil to use on a game book, Plaintiff was not given paper.

On December 20, 2011, Plaintiff's sister sent a written complaint to Defendant Heyns, which was copied to Governor Snyder and Attorney General Schuette.  Plaintiff's sister also contacted Michigan congressmen and the Ombudsman's office.  On December 22, another sister

telephoned Defendant Yokum.  Yokum advised her that the investigation was complete and that Plaintiff would remain in segregation until he was shipped out, because he would not be staying at RMI.  On December 26, Plaintiff's sister again contacted Defendant Heyns about the alleged retaliation.  Plaintiff was ordered to pack his personal property for a transfer on December 28, 2011. He was transferred to DRF on December 29, 2011.  Plaintiff complains that he was not personally advised that the investigation was complete, nor was he given a reason for his placement in traditional segregation.  On January 2, 2012, Plaintiff's sister again sent a letter to Defendant Heyns, complaining about the events leading to Plaintiff's transfer.

In his complaint, Plaintiff alleges that, as the result of his confinement to administrative and protective segregation for two weeks, his muscles atrophied, causing him to experience severe pain and exhaustion for several weeks whenever he walked to the meal hall.  He also complains that his lack of a tooth brush for two weeks and lack of tooth powder for three days caused a filling to fall out and his tooth to rot.

On the night of February 20, 2012, Plaintiff fell asleep while his roommate was still awake.  The following morning, during the prisoner count, Plaintiff was told by a correctional officer that his door was unlocked and open, and he would be getting a ticket.  The guard told Plaintiff that he could not file a grievance contesting the ticket.  Plaintiff's sister wrote to Defendants Smith and Heyns.  Plaintiff himself "sent out a barrage of letters to the President, Governor, Attorney General, and a number of other people about his wrongful conviction, incarceration and circumstance."  (*Id.* ¶ 79, Page ID#22.)  Approximately two days later, Defendant Christiansen called Plaintiff into his office, telling Plaintiff it was routine.  Christiansen asked how he was doing and if he had any problems.  Plaintiff did not complain about his muscle atrophy or dental problems,

ostensibly because he feared retaliation.  He also feared that, because of being called into Inspector

Christiansen's office, he would again be labeled a snitch.

On December 5, 2012, Plaintiff was transferred to MCF, arriving at approximately

11:00 a.m.  Plaintiff complains that he did not receive his property for two days, in violation of

prison policy.  He also alleges that, because he did not have his hygiene items, he was forced to

attend his family visit without having showered or changed clothes for two days.  Plaintiff

complained to Defendant Pettit, who told him that he could refuse the visit.  When Plaintiff

continued to complain, Pettit said, "It looks like you want to ride out of here.  I can make that

happen."  (*Id.* ¶ 88, Page ID#14.)  Pettit asked for Plaintiff's identification and went into an office.

When Pettit returned the identification, Plaintiff went to his visit.  Plaintiff complained to his family

about Pettit.  The family asked the on-duty visiting-room correctional officer to notify Defendant

Jackson that they would like a meeting.  The officer made several calls.  A lieutenant arrived and

asked if he could help.  Plaintiff's sister, however, requested a meeting with Defendant Deputy

Warden Jackson.  The family then observed Defendant Jackson leaving the facility.  The officer in

the visiting room refused to stop Defendant Jackson, saying that he had received orders not to

contact Defendant Jackson.  Defendant Pettit then came to the visiting room to speak with Plaintiff's

sister.  Pettit refused the family's demands to notify a superior, and he subsequently became angry

and allegedly falsified information to Plaintiff's sister.  Plaintiff learned after the visit that Defendant

Pettit had ordered that all cameras be trained on Plaintiff and his family, allegedly causing a breach

of safety to all other visitors.  Plaintiff received his property after the visit ended at 8:30 p.m.

Plaintiff began going to the law library three times every week.  Plaintiff alleges that

he was advised that the mornings had openings because many inmates had jobs and could not be

there at that time.  In December 2012, Plaintiff had no difficulty obtaining library access.  Beginning in January 2013, however, Plaintiff was not allowed access to the library.  Plaintiff allegedly had several court deadlines for which he needed to complete legal filings.   His sister contacted Defendant Jeffery, explaining Plaintiff's need.  Defendant Jeffery stated that Plaintiff would be able to go to the law library.  Plaintiff, however, did not receive a call-out for the library until Plaintiff's sister contacted Jeffery again.  Jeffery advised that Plaintiff's library request did not contain a legible inmate number.  Plaintiff's Assistant Resident Unit Supervisor (ARUS) told Plaintiff that Defendant Hardiman had advised him that Plaintiff did not receive his call out because the inmate number was not legible.  Plaintiff ultimately confirmed that his original request had been destroyed and a new, illegible kite had been written by someone else.

During their discussions, Defendant Jeffery told Plaintiff's sister that, if Plaintiff needed a typewriter, one was located on each floor of the housing unit.  Plaintiff contends that the representation was untrue.  Plaintiff also alleges that Jeffery told Plaintiff's sister that she could bring court documents to Plaintiff for review and signature, but that, if the law library was full, Plaintiff would not have access to it.

Plaintiff filed a grievance against Defendant Hardiman in January, because he had only received one call-out for the library during the entire month.  Defendant Simmons met with Plaintiff to discuss his grievance, which contained two issues.  Simmons permitted Plaintiff to file two new timely grievances in exchange for dismissing the grievance containing multiple issues.  Immediately prior to his meeting with Simmons, Plaintiff received several call-outs for the library, but those call-outs stopped after the meeting.  At 4:10 on a Friday afternoon, Defendant Winger called Plaintiff to the correctional officer's desk to discuss the two new grievances.  Winger advised

Plaintiff that Defendant Hardiman was on leave, but that Defendant Jeffery explained that the reason that Plaintiff did not get a call-out was that the library slots were full, and Plaintiff was too picky about his times.  Winger told Plaintiff that she was going to deny the grievance.  When Plaintiff received his grievance back, he saw that Winger had checked the box stating that Plaintiff had been interviewed.  Plaintiff claims that the statement was forged and false and the investigation was improper because Winger had already made up her mind before speaking with Plaintiff.

Plaintiff typed another letter to Defendant Heyns and sent it to his sister, but he asked his sister not to mail it, as he was afraid of further retaliation.  The mail room reviewed Plaintiff's outgoing letter to his sister and returned it to him.  Plaintiff filed a grievance, which was denied by Winger and returned to him a week later, with a box checked that Plaintiff had been interviewed. During May, Plaintiff was called to the library only one time.  He also received his Step II grievance response, in which Defendant Jackson indicated that Plaintiff's grievance was filed too late and that he was too picky about his library times.

On January 22, 2013, while Plaintiff's library complaints were ongoing, he began a prison job as the Food Tech Tutor.  After several months, Plaintiff concluded from other prison tutors' information that he was not being paid properly for his position and certificates.  In June 2013, after completing another certificate, Plaintiff contacted Defendant Mack and asked her to check to see if his pay was appropriate under the policy.  On October 18, 2013, Plaintiff sent a kite to Defendant Mack, copying Defendant Burt and Plaintiff's supervisor Michael Shaw.  Plaintiff alleges that Shaw told him that Defendant Mack had been aware of Plaintiff's certificates before hiring him.  Defendant Burt eventually responded to the kite, informing Plaintiff that the policy did not apply to Plaintiff and his circumstances.  Plaintiff requested reconsideration, and Burt's response

was obscure.  Plaintiff alleges that he has been chilled from filing further grievances by the purportedly false statements on grievances, the failure to comply with MDOC policies, and the forging of one of his call-out requests.  Plaintiff also complains that Defendant Burt has failed to correct the disparity of pay between Plaintiff and other similarly situated tutors.

On November 25, 2013, Plaintiff appeared at a court hearing by way of electronic video feed.  The following day, Plaintiff delivered to his ARUS a large manila envelope for mailing.  The ARUS accepted it for immediate mailing.  The packet contained time-sensitive documents for the Michigan Court of Appeals.  Despite the fact that mail service from Muskegon to Grand Rapids typically is one day, the packet was not received until December 3, 2013.  Plaintiff also complains that mail to and from his sister has been delayed or not delivered within a timely period.

Plaintiff alleges that he has not told other inmates about the charges on which he is incarcerated.  On one occasion, a correctional officer called across a crowded visiting room, "Denhof, you have legal mail[."]  (*Id.* ¶ 129, Page ID#29.)  Plaintiff's sister complained that the officer should not have shouted, as the information was confidential.  On February 28, 2014, an inmate with whom Plaintiff was housed at MRI approached Plaintiff, accompanied by other inmates.  They asked if Plaintiff was incarcerated for CSC.  The inmate was extremely angry and threatened to "take care of" Plaintiff.  (*Id.* ¶ 132.)  Plaintiff retrieved transcripts allegedly showing that the victim was lying, and he explained that his sister was a Grand Rapids police officer who had won a federal lawsuit against the department.  Later, the prisoner block representative came to Plaintiff's cell and told him that staff had released the information in order to force Plaintiff into lock-up, from which he could be transferred to another prison.

-10-

On March 27, 2014, Plaintiff cleaned the visiting room after visitation, as he had done for the prior 15 months. Plaintiff was called to the desk and advised that he could not throw away garbage. Plaintiff asked to see the visiting room rules, but the officer referred him to his own unit or the computer. The rules were no longer posted in his unit, and Plaintiff could not find the rules the next day.

Plaintiff complains that he had a time-sensitive court filing due, but the library typewriters were nonfunctional for 29 days. Plaintiff's sister therefore typed the filings and sent them to Plaintiff in separate envelopes, which were delivered to the prison on March 19, 2014. When Plaintiff still had not received them three days later, Plaintiff's sister contacted Defendant Jeffery. Jeffery advised her that the envelopes had been given to Defendant Burt's assistant to determine if they violated the rule on how many pages can be delivered and if they had been mailed in separate packages to circumvent the rule. Plaintiff received the materials the next day.

Plaintiff complains about numerous other delays in receiving mailings, sometimes more than 10 days after they were received by the prison. Plaintiff received an order from a court on April 10, 2014. He had 14 days in which to file a motion. Plaintiff typed and submitted the motion for copying on April 19 at 1:00 p.m., indicating the time pressure. He did not receive the copies the next day. On Monday, April 21, 2014, Plaintiff spoke to Defendant Jenkins about the copies. Jenkins advised that he could not get the copies until after Hardiman left for the day at 2:00 p.m., but he would try thereafter. Jenkins did not make the copies before the end of his shift at 5:00 p.m. Plaintiff's sister called Defendant Jackson, who indicated that he would make an exception to the three-day copy policy. Plaintiff received the copies at 3:30 p.m., but he could not get them mailed on April 21, 2014.

Plaintiff alleges that Defendants generally have violated the First Amendment by retaliating against him for his complaints about prison conditions, including transferring him to segregation, labeling him a snitch, depriving him of contact visits and telephone privileges, threatening him with misconduct tickets, denying him the grievance process, and threatening him with transfer.  He also alleges that Defendants violated his Eighth Amendment rights by depriving him of water and hygiene items.  In addition, Plaintiff alleges that he was deprived of his right to access the courts when Defendant Hardiman denied him access to the law library and waited three days to make copies necessary to support a motion he was filing in state court, causing them to be late.  Moreover, he alleges that Defendants MDOC, Heyns, Palmer and Kipp failed to protect Plaintiff, despite having knowledge of the risk to Plaintiff.  Further, Defendants Yokum, Sutton and Dutcher allegedly initiated, facilitated or participated in retaliatory action and imposed unconstitutional conditions of confinement.  Finally, Plaintiff claims that Defendants MDOC, Heyns, Palmer, Kipp, Burt, Smith and Jackson failed to train and supervise their subordinates so as to fail to protect Plaintiff from retaliation and Eighth Amendment violations.

For relief, Plaintiff seeks compensatory and punitive damages.

II.     Sovereign Immunity

Plaintiff may not maintain a § 1983 action against either the State of Michigan or the Michigan Department of Corrections.  Regardless of the form of relief requested, the states and their departments are immune under the Eleventh Amendment from suit in the federal courts, unless the state has waived immunity or Congress has expressly abrogated Eleventh Amendment immunity by statute.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-101 (1984); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978); *O'Hara v. Wigginton*, 24 F.3d 823, 826 (6th Cir. 1993).  Congress

has not expressly abrogated Eleventh Amendment immunity by statute, *Quern v. Jordan*, 440 U.S. 332, 341 (1979), and the State of Michigan has not consented to civil rights suits in federal court. *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986).  In numerous unpublished opinions, the Sixth Circuit has specifically held that the MDOC is absolutely immune from suit under the Eleventh Amendment.  *See, e.g.*, *McCoy v. Michigan*, 369 F. App'x 646, 653-54 (6th Cir. 2010); *Turnboe v. Stegall*, No. 00-1182, 2000 WL1679478, at *2 (6th Cir. Nov. 1, 2000).  In addition, the State of Michigan (acting through the MDOC) is not a "person" who may be sued under § 1983 for money damages.  *See Lapides v. Bd. of Regents*, 535 U.S. 613 (2002) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989)).  Therefore, the Court dismisses the State of Michigan and the Michigan Department of Corrections.

III.   Failure to state a claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 679.  Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than

-13-

a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### A.    Access to the Courts

Plaintiff complains that his incoming and outgoing mail, including legal mail, was delayed by several days on a variety of occasions while he was at MCF. He also complains that Defendant Hardiman did not allow him library time in January and May 2013, and that Defendant Jeffery did not resolve the problem. In addition, he alleges that Defendant Jeffery failed to ensure that Plaintiff received his legal mail for signing in March 2014. Finally, Plaintiff alleges that Defendant Hardiman refused to make copies of certain attachments to be filed with Plaintiff's brief to the state court in April 2014.

-14-

It is well established that prisoners have a constitutional right of access to the courts. *Bounds v. Smith*, 430 U.S. 817, 821 (1977). The principal issue in *Bounds* was whether the states must protect the right of access to the courts by providing law libraries or alternative sources of legal information for prisoners. *Id.* at 817.  The Court further noted that in addition to law libraries or alternative sources of legal knowledge, the states must provide indigent inmates with "paper and pen to draft legal documents, notarial services to authenticate them, and with stamps to mail them." *Id.* at 824-25.  The right of access to the courts also prohibits prison officials from erecting barriers that may impede the inmate's accessibility to the courts. *See Knop v. Johnson*, 977 F.2d 996, 1009 (6th Cir. 1992).

An indigent prisoner's constitutional right to legal resources and materials is not, however, without limit.  In order to state a viable claim for interference with his access to the courts, a plaintiff must show "actual injury." *Lewis v. Casey*, 518 U.S. 343, 349 (1996); *see also Talley-Bey v. Knebl*, 168 F.3d 884, 886 (6th Cir. 1999); *Knop*, 977 F.2d at 1000.  In other words, a plaintiff must plead and demonstrate that the shortcomings in the prison legal assistance program or lack of legal materials have hindered, or are presently hindering, his efforts to pursue a nonfrivolous legal claim. *Lewis*, 518 U.S. at 351-53; *see also Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996).

In addition, the Supreme Court squarely has held that "the underlying cause of action . . . is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002) (citing *Lewis*, 518 U.S. at 353 & n.3). "Like any other element of an access claim, the

underlying cause of action and its lost remedy must be addressed by allegations in the complaint sufficient to give fair notice to a defendant."  *Id.* at 416.

Plaintiff fails to allege than he suffered any actual injury from Defendants' conduct. Even assuming that the court deadlines Plaintiff discusses were of the sort protected under *Lewis*, 518 U.S. at 351-53, he fails to allege that any delays resulted in harm to his legal proceedings. Although he alleges that he had certain court deadlines, he does not allege that his documents were rejected because they were late or that any negative action was taken as the result of the delay.  As a consequence, the Court will dismiss Plaintiff's access-to-the-courts claims.

### B.      Eighth Amendment

Plaintiff alleges that he was deprived of water on one occasion in the visitation room at RMI, and that he did not have a cup to drink out of while he was in segregation.  He also alleges that he was deprived of his basic hygiene items for between three and thirteen days while in segregation and protective custody at RMI, and he again went without those items for two days following his transfer to MCF.  Plaintiff also complains that his placement in a single segregation cell for thirteen days at RMI violated the Eighth Amendment because it caused him to experience severe muscle atrophy.  In addition, he alleges that he was placed at risk of harm when RMI Defendants placed a different color card next to his segregation door, indicating that he was in protective custody, thereby causing other segregation inmates to think that he was a "snitch."

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes.  Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency."  *Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981).  The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and

wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600-01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954. In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479-80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate indifference standard to medical claims); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims)).

Plaintiff's allegations fall far short of demonstrating an Eighth Amendment violation. His brief deprivation of water in the visiting room is nothing more than a minor, temporary inconvenience that does not rise to the level of an Eighth Amendment violation. *See Dellis v. Corr. Corp. of Am.*, 257 F.3d 508, 511 (6th Cir. 2001); *see also J.P. v. Taft*, 439 F. Supp. 2d 793, 811 (S.D. Ohio 2006) ("[M]inor inconveniences resulting from the difficulties in administering a large detention facility do not give rise to a constitutional claim.)" (internal citation omitted)). In addition, although Plaintiff complains that he did not have a cup to drink out of while he was in segregation, he acknowledges that he had access to water and could use his hands as a cup.

-17-

Plaintiff's allegations about the lack of his hygiene items are similarly mere inconveniences. While the Sixth Circuit has recognized that the deprivation of a toothbrush for 337 days is sufficient to raise an Eighth Amendment claim, *see Flanory v. Bonn*, 604 F.3d 249, 256 (6th Cir. 2010), the court acknowledged that more limited periods of deprivation of soap, toothbrushes, and toothpaste did not rise to the level of an Eighth Amendment violation, *id.* at 254. *See also Harris v. Fleming*, 839 F.2d 1232, 1235-36 (7th Cir. 1988) (no constitutional deprivation where prison officials failed to provide toilet paper for five days and soap, toothbrush, and toothpaste for ten days, notwithstanding other, significant unsanitary conditions). Although Plaintiff did not have his hygiene items during the three days of segregation, he did receive tooth powder on the third day. A deprivation of all tooth-cleaning material for three days is far too minimal to constitute a constitutional injury. *See Richmond v. Settles*, No. 09-6285, 2011 WL 6005197, at *6 (6th Cir. Dec. 2, 2011) (deprivation of personal hygiene items for six days is not actionable); *Siller v. Dean*, No. 995323, 2000 WL 145167 (6th Cir. Feb. 1, 2000). Even without a toothbrush, Petitioner could use his finger and/or a towel to maintain dental health for such a short period. Moreover, while he claims that he did not immediately receive hygiene items when he reached the protective custody cell, he does not allege that he was denied those items for the entire 13-day period preceding his transfer. Indeed, he acknowledges that he packed his personal property before he was shipped out. Moreover, he acknowledges that Defendant Sutton authorized the return of his personal property, and he does not identify any Defendant who refused to bring that property. "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. Plaintiff fails to plead what Defendant actually denied his hygiene items.

-18-

Regardless, because he had tooth powder after three days, even if he went 13 days without a toothbrush and soap, his claim still would fail. *See Crump v. Janz*, No. 1:10-cv-583, 2010 WL 2854266, at *4 (W.D. Mich. July 19, 2010) (finding no constitutional deprivation from 35 days without deodorant, toothbrushes, and toothpaste, among other items). Moreover, Plaintiff's claim that he lost a filling as a result of the brief period of deprivation is wholly conclusory and not worthy of belief. While Plaintiff may have lost a filling at some point, it defies credulity that the lost filling was caused by a brief period in which Plaintiff could not brush. The Court rejects the allegation as factually frivolous. *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) (holding that the court has the "unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless"); *see also Lawler v. Marshall*, 898 F.2d 1196, 1198 (6th Cir. 1990).

Plaintiff next complains that his placement in segregation and protective custody for 13 days was itself cruel and unusual punishment. Placement in segregation is a routine discomfort that is "'part of the penalty that criminal offenders pay for their offenses against society.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Rhodes*, 452 U.S. at 347; *see also Jones v. Waller*, No. 98-5739, 1999 WL 313893, at *2 (6th Cir. May 4, 1999). Although it is clear that Plaintiff was denied certain privileges as a result of his administrative segregation, he does not allege or show that he was denied basic human needs and requirements. The Sixth Circuit has held that without a showing that basic human needs were not met, the denial of privileges as a result of administrative segregation cannot establish an Eighth Amendment violation. *See Evans v. Vinson*, 427 F. App'x 437, 443 (6th Cir. 2011); *Harden-Bey v. Rutter*, 524 F.3d 789, 795 (6th Cir. 2008). Plaintiff's allegation that he experienced severe muscle atrophy after less than two weeks in a single cell, like

his allegation concerning the loss of a filling, is patently frivolous.  *Neitzke*, 490 U.S. at 327.

Plaintiff was not prevented from all exercise simply because he was placed in a segregation cell.

Plaintiff does not allege that he was strapped to a bed.  Nothing about his placement in segregation

stopped him from doing any number of exercises to keep his muscles from atrophying – squats,

pushups, sit-ups, running in place.  His frivolous allegation concerning muscle atrophy fails to

support an Eighth Amendment violation.  Moreover, Plaintiff cannot bring an Eighth Amendment

claim for emotional or mental damages without a physical injury.  *See* 42 U. S.C. §1997e(e); *see*

*also Hudson*, 503 U.S. at 5; *Harden-Bey*, 524 F.3d at 795.

        Finally, Plaintiff fails to allege facts sufficient to support a conclusion that

Defendants failed to protect him by placing a different color card outside his segregation cell for

three days, indicating that he was in protective custody.  In its prohibition of "cruel and unusual

punishments," the Eighth Amendment places restraints on prison officials, directing that they may

not use excessive physical force against prisoners and must also "take reasonable measures to

guarantee the safety of the inmates."  *Farmer*, 511 U.S. at 832 (quoting *Hudson*, 468 U.S. at

526-527). To establish liability under the Eighth Amendment for a claim based on a failure to

prevent harm to a prisoner, a plaintiff must show that the prison officials acted with "deliberate

indifference" to a substantial risk that the defendant would cause prisoners serious harm.  *Farmer,*

511 U.S. at 834; *Helling*, 509 U.S. at 32 (1993); *Woods v. Lecureux*, 110 F.3d 1215, 1222 (6th Cir.

1997); *Street*, 102 F.3d at 814; *Taylor v. Mich. Dep't of Corr.* 69 F.3d 76, 79 (6th Cir. 1995).  *See*

*Curry v. Scott*, 249 F.3d 493, 506 (6th Cir. 2001).

        Even assuming that the use of a differently colored protective-custody card could

have allowed other segregation inmates to assume that Plaintiff was a snitch, he fails entirely to

-20-

demonstrate that he was placed at a substantial risk of harm.  Every segregation prisoner, like Plaintiff, was housed in his own cell and shackled whenever he was transported.  Under such circumstances, Plaintiff was at no risk from any other inmate.  Moreover, before being released from protective custody, Plaintiff was transferred to another prison, where no one would have been aware of the protective-custody designation.

Further, Plaintiff's allegations that other inmates and guards called him names do not rise to an Eighth Amendment violation.  The use of harassing or degrading language by a prison official, although unprofessional and deplorable, does not rise to constitutional dimensions.  *See Ivey*, 832 F.2d at 954-55; *see also Johnson v. Dellatifa*, 357 F.3d 539, 546 (6th Cir. 2004) (harassment and verbal abuse do not constitute the type of infliction of pain that the Eighth Amendment prohibits); *Violett v. Reynolds,* No. 02-6366, 2003 WL 22097827, at *3 (6th Cir. Sept. 5, 2003) (verbal abuse and harassment do not constitute punishment that would support an Eighth Amendment claim); *Thaddeus-X v. Langley*, No. 96-1282, 1997 WL 205604, at *1 (6th Cir. Apr. 24, 1997) (verbal harassment is insufficient to state a claim); *Murray v. U.S. Bureau of Prisons*, No. 95-5204, 1997 WL 34677, at *3 (6th Cir. Jan. 28, 1997) ("Although we do not condone the alleged statements, the Eighth Amendment does not afford us the power to correct every action, statement or attitude of a prison official with which we might disagree."); *Clark v. Turner*, No. 96-3265, 1996 WL 721798, at *2 (6th Cir. Dec. 13, 1996) ("Verbal harassment and idle threats are generally not sufficient to constitute an invasion of an inmate's constitutional rights."); *Brown v. Toombs*, No. 92-1756, 1993 WL 11882 (6th Cir. Jan. 21, 1993) ("Brown's allegation that a corrections officer used derogatory language and insulting racial epithets is insufficient to support his claim under the

-21-

Eighth Amendment.").  Accordingly, Plaintiff fails to state an Eighth Amendment claim against any Defendant arising from his alleged verbal abuse.

In sum, Plaintiff fails to state an Eighth Amendment claim against Defendants.

C.      Due Process

Plaintiff suggests that he was deprived of due process when Defendants failed to advise him when the investigation into his letter was complete.  He also seems to allege that he was deprived of due process when he did not receive his property or mail within the time required under prison policy directives.  Further, he suggests that Defendant Simmons violated due process by rejecting a grievance for raising multiple issues and that Winger denied his grievances without due process.  Finally, Plaintiff appears to suggest that he was denied the correct pay scale when he was employed as a Food Tech Tutor.

First, Plaintiff has no due process right to file a prison grievance. The Sixth Circuit and other circuit courts have held that there is no constitutionally protected due process right to an effective prison grievance procedure.  *Walker v. Mich. Dep't of Corr.,* 128 F. App'x 441, 445 (6th Cir. 2005); *Argue v. Hofmeyer*, 80 F. App'x 427, 430 (6th Cir. 2003); *Young v. Gundy,* 30 F. App'x 568, 569-70 (6th Cir. 2002); *Carpenter v. Wilkinson,* No. 99-3562, 2000 WL 190054, at *2 (6th Cir. Feb. 7, 2000); *see also Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996); *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994).   Michigan law does not create a liberty interest in the grievance procedure.  *See Olim v. Wakinekona,* 461 U.S. 238, 249 (1983); *Keenan v. Marker*, 23 F. App'x 405, 407 (6th Cir. 2001); *Wynn v. Wolf*, No. 93-2411, 1994 WL 105907, at *1 (6th Cir. Mar. 28, 1994). Because Plaintiff has no liberty interest in the grievance process, Defendants' conduct did not deprive him of due process.

Second, Plaintiff fails to cite and the Court is unaware of any case suggesting that a prisoner has a due process right to be informed about the progress of any investigation.  The claim is wholly unsupported and will be dismissed.

Third, Defendants' alleged failure to comply with an administrative rule or policy in delivering Plaintiff's personal property or any other matter does not itself rise to the level of a constitutional violation. *Laney v. Farley*, 501 F.3d 577, 581 n.2 (6th Cir. 2007); *Smith v. Freland*, 954 F.2d 343, 347-48 (6th Cir. 1992); *Barber v. City of Salem*, 953 F.2d 232, 240 (6th Cir. 1992); *McVeigh v. Bartlett*, No. 94-23347, 1995 WL 236687, at *1 (6th Cir. Apr. 21, 1995) (failure to follow policy directive does not rise to the level of a constitutional violation because policy directive does not create a protectible liberty interest). Section 1983 is addressed to remedying violations of federal law, not state law. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982); *Laney*, 501 F.3d at 580-81.

Finally, Plaintiff claims that he was paid at the wrong rate for his prison job, in violation of due process. The Sixth Circuit consistently has found that prisoners have no constitutionally protected liberty interest in prison employment under the Fourteenth Amendment. *See, e.g.*, *Dellis*, 257 F.3d at 511 (6th Cir. 2001) (district court properly dismissed as frivolous the plaintiff's claim that he was fired from his prison job); *Newsom v. Norris*, 888 F.2d 371, 374 (6th Cir. 1989) (no constitutional right to prison employment); *Ivey*, 832 F.2d at 955 ("[N]o prisoner has a constitutional right to a particular job or to any job"); *Carter v. Tucker*, No. 03-5021, 2003 WL 21518730, at *2 (6th Cir. July 1, 2003) (same). Morever, "as the Constitution and federal law do not create a property right for inmates in a job, they likewise do not create a property right to wages for work performed by inmates." *Carter*, 2003 WL 21518730, at *2 (citing *Williams v. Meese*, 926 F.2d 994, 997 (10th Cir. 1991), and *James v. Quinlan*, 866 F.2d 627, 629-30 (3d Cir. 1989)). Under these authorities, Plaintiff fails to state a due process claim arising from his pay for prison employment.

-24-

D.        **Retaliation**

Plaintiff makes sweeping claims that all Defendants retaliated against him for exercising his First Amendment rights, though he makes few specific allegations that he attributes to named individuals.  Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution.  *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish that:  (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct.  *Id.* Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct.  *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

1.        Retaliation at RMI

Plaintiff alleges that he wrote a letter to Defendant Heyns on December 12, 2011, which Heyns forwarded to RMI for investigation.  Plaintiff claims that, in response to the letter, Dutcher retaliated against him by placing him in the general segregation area, rather than in a different, protective segregation unit, for a period of three days between December 15 and December 18.  Plaintiff complains that the placement in segregation resulted in changes to his visitation privileges.  He also complains that his placement in segregation led to other officers "retaliating" against him by enforcing regular segregation rules barring him from using the phone, having his personal property, being transported without handcuffs and shackles, having his name on a different color room card indicating protective custody, and being subjected to offensive remarks.  After

being transferred to the protective custody wing on December 18, Plaintiff asked Defendant Sutton for a mental health visit, but Defendant told him that no mental health personnel were available. Sutton also allegedly authorized Plaintiff to receive his personal property, but failed to ensure that Plaintiff was given it. Plaintiff also complains that Defendant Yokum told Plaintiff's sister on December 22, 2011 that the investigation was complete and that Plaintiff would remain in segregation until he was transferred to another prison.

The filing of a prison grievance is constitutionally protected conduct for which a prisoner cannot be subjected to retaliation. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001). The Court will assume without deciding that Plaintiff's allegation that he wrote a letter to Defendant Heyns is sufficient to demonstrate that he was engaged in protected conduct at the time the underlying events occurred.

It is well recognized that "retaliation" is easy to allege and that it can seldom be demonstrated by direct evidence. *See Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005); *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987); *Vega v. DeRobertis*, 598 F. Supp. 501, 506 (C.D. Ill. 1984), *aff'd*, 774 F.2d 1167 (7th Cir. 1985). "[A]lleging merely the ultimate fact of retaliation is insufficient." *Murphy*, 833 F.2d at 108. "[C]onclusory allegations of retaliatory motive 'unsupported by material facts will not be sufficient to state . . . a claim under § 1983.'" *Harbin-Bey*, 420 F.3d at 580 (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538-39 (6th Cir. 1987)); *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *Skinner v. Bolden*, 89 F. App'x 579, 579-80 (6th Cir. 2004) (without more, conclusory allegations of temporal proximity are not sufficient to show a retaliatory motive).

-26-

To the extent that Plaintiff complains that Defendants Yokum and Dutcher made misrepresentations to Plaintiff's family, he fails to state a claim. Nothing about Defendants' representations to Plaintiff's family is relevant to Plaintiff's own alleged constitutional deprivations, and Plaintiff may not claim injury on behalf of another. *See Newsom v. Norris*, 888 F.2d 371, 381 (6th Cir. 1989); *O'Malley v. Brierley*, 477 F.2d 785 (3d Cir. 1973); *Lutz v. LaVelle*, 809 F. Supp. 323, 325 (M.D. Pa. 1991); *Snead v. Kirkland*, 462 F. Supp. 914, 918 (E.D. Pa. 1978).

Moreover, while claiming that his placement in segregation was retaliatory, Plaintiff alleges no facts that would support that claim. Instead, the facts he recites strongly indicate that he was placed in segregation for protective reasons. In fact, Plaintiff does not actually dispute his placement in protective custody, he merely contends that he should have been placed in a different segregation unit, one that is strictly for persons in protective custody. In addition, Plaintiff makes no allegation that Dutcher engaged in any adverse action other than placing Plaintiff in segregation. Further, Plaintiff's claim that Dutcher was acting for retaliatory reasons in interviewing Plaintiff is belied by Plaintiff's description of Defendant Dutcher's conduct and representations. According to the complaint, Dutcher referenced the letter to Heyns in asking Plaintiff about whether he wanted protection. Plaintiff does not deny that his letter to Heyns was a complaint about his dangerous conditions, and he does not suggest that he told Dutcher that he did not want protection. Dutcher allowed Plaintiff to make a telephone call, encouraged him to calm his sister down, and offered the use of the telephone at a later time. In addition, Plaintiff acknowledged that he was never accused of a violation or given a ticket. Finally, regardless of whether Yokum or Dutcher told Plaintiff's sister something that she and Plaintiff believe was contradictory on some unexplained point does not indicate that Defendants were lying to her, much less that they were engaging in retaliatory

actions against Plaintiff.  In sum, Plaintiff's conclusory allegations about retaliation at RMI fail to state a claim.

### 2.      Retaliation at DRF

Plaintiff next alleges that he was subjected to retaliation and placed in fear for his safety at DRF.  He alleges that, on February 21, 2012, he was advised during morning count that a correctional officer had found his door unlocked and open at midnight.  The officer informed Plaintiff that he would be receiving a misconduct ticket and that Plaintiff could not file a grievance about a misconduct.  Plaintiff complains that, when he went to sleep the previous evening, his cellmate was still awake, apparently implying that the unlocked door was his cellmate's fault.  Several months later, Plaintiff sent out a barrage of letters to state and national officials about his wrongful conviction and incarceration.  Two days later, he was called into Defendant Inspector Christiansen's office on a purportedly routine matter.  Christiansen asked how Plaintiff was doing, but Plaintiff refused to tell Christiansen about his physical or dental complaints, ostensibly because he feared that he would be labeled a snitch.  Plaintiff was transferred to MCF on December 5, 2012, some months later.

With respect to the incident involving Plaintiff's unlocked cell, Plaintiff fails to allege any of the elements of a retaliation claim.  At the outset, Plaintiff identifies no protected conduct at DRF that preceded the February 21, 2012 incident.  In addition, the officer who allegedly declared an intent to issue a misconduct ticket is unidentified, preventing Plaintiff from assigning responsibility to any named Defendant.  *Iqbal*, 556 U.S. at 676.

Further, any refusal to allow Plaintiff to file a grievance about a misconduct ticket is not adverse for two reasons.  First, under MICH. DEP'T OF CORR., Policy Directive 03.02.130 ¶¶

F(2) and (4), the grievance process is not available to challenge major or minor misconduct decisions.  In those circumstances, prisoners receive hearings in accordance with the prisoner discipline process set forth in MICH. DEP'T OF CORR., Policy Directive 03.03.105.  Second, the inability to file a grievance does not amount to adverse action.  *See Thaddeus-X*, 175 F.3d at 394 (to be adverse, conduct must be capable of deterring a person of ordinary firmness from continuing to engage in that conduct).  The inability to file a grievance cannot impair a prisoner's right to access the courts, because 42 U.S.C. § 1997e(a) requires prisoners to exhaust only "such administrative remedies as are available" prior to filing suit in federal court.  *Kennedy v. Tallio*, 20 F. App'x 469, 471 (6th Cir. 2001).  If a prisoner is deprived of the ability to file a grievance the process is deemed unavailable and will not bar litigation.  *Id.*  As a consequence, the officer's statement that Plaintiff could not file a grievance was not an adverse action.

Finally, Plaintiff provides no factual allegations that would suggest that the officer issued the misconduct ticket for a retaliatory reason.  He therefore cannot demonstrate the third prong of the *Thaddeus-X* test.

With respect to Defendant Christiansen, Plaintiff has alleged no conduct that was adverse and no facts suggesting that Christiansen had a retaliatory motive for his limited actions.  Christiansen did no more than call Plaintiff into his office to inquire about Plaintiff's well-being.  Plaintiff alleges no negative consequence from Christiansen's inquiry.  Plaintiff's paranoia about the reasons for and possible result of the apparently innocuous inquiry is not a sufficient factual basis on which to base a claim of retaliation.

-29-

3.      Retaliation at MCF

Plaintiff complains that he experienced retaliation while at MCF.  His allegations, however, again fall short in numerous ways.

Plaintiff first complains that, nearly two days after his arrival at MCF, he had not received his personal property.  Plaintiff complained to Defendant Pettit that he did not want to go to the visiting room without having showered or changed his clothes in two days.  Defendant Pettit told Plaintiff that he could refuse the visit.  Plaintiff continued to complain that he wanted the visit, but he would have liked to be showered and changed.  Pettit remarked, "It looks like you want to ride out of here.  I can make that happen.  Give me your id."  (Compl., Page ID#23.)  Pettit then took Plaintiff's identification for a few minutes and returned it to Plaintiff, and Plaintiff proceeded to his visit.

Even assuming that Plaintiff's repeated complaints about his desire for a shower was protected conduct, Pettit's actions were not sufficiently adverse to support a claim of retaliation.  A specific threat of harm may, in some circumstances, satisfy the adverse-action requirement if it would deter a person of ordinary firmness from exercising his or her First Amendment rights.  *See, e.g., Thaddeus-X*, 175 F.3d at 396, 398 (threat of physical harm); *Smith v. Yarrow*, 78 F. App'x 529, 542 (6th Cir. 2003) (threat to change drug test results).  However, threats such as Pettit's, are so "*de minimis*," "inconsequential," or "trivial" that they cannot sustain a First Amendment retaliation claim."  *See Thaddeus-X*, 175 F.3d at 398; *see also Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 1994) ("Mere threats . . . are generally not sufficient to satisfy the adverse action requirement."); *Smith*, 78 F. App'x at 542.  Moreover, even if Plaintiff had been laterally transferred to another prison (which he was not), such a transfer would not, without more, rise to the level of

-30-

adverse action. *See Hill v. Lappin*, 630 F.3d 468, 474 (6th Cir. 2010) (distinguishing ordinary transfers, which do not constitute adverse action, from transfers to administrative segregation, another prison's lock-down unit or similar punitive transfers) (citing *Siggers-El v. Barlow*, 412 F.3d 693, 701-02 (6th Cir. 2005)).

Immediately after his encounter with Defendant Pettit, Plaintiff visited with his family, complaining that he had not received his property and about Defendant Pettit. Plaintiff's family asked that Defendant Deputy Warden Jackson be informed about the incident. The on-duty officer in the visiting room made several phone calls, after which a lieutenant arrived. Not satisfied, Plaintiff's sister insisted upon meeting Defendant Jackson. When the family observed Jackson leave the facility without meeting with them, they demanded that the on-duty officer stop him. He reported that he had received orders not to contact Defendant Jackson. At that point, Defendant Pettit came into the visiting room and contacted Plaintiff's sister. He refused her demands to notify a superior, and he eventually became angry and "verbally aggressive." (Compl., Page ID#24.) After his visit ended, Plaintiff learned that Defendant Pettit had ordered all cameras to watch Plaintiff and his family, ostensibly causing a breach of safety to other visitors.

None of these events amounts to adverse action. While Plaintiff and his family may have wanted things that they did not get, nothing adverse was done to Plaintiff or his family. Moreover, as previously discussed, Plaintiff is not permitted to make claims about alleged harms or risks to anyone other than himself. *Newsom*, 888 F.2d at 381.

Plaintiff next complains that he had difficulty accessing the library during January and May 2013. He contends that Defendant Jeffery provided inadequate and inaccurate responses to Plaintiff's sister about the problem, that Defendant Simmons found his grievance wanting, that

-31-

Defendant Hardiman did not issue him a library pass and did not make copies, that Defendant Winger unfairly denied his grievances, that Defendant Heyns ignored his letters, and that Defendant Burt told him that his library request was late and that he was too picky about times. None of these alleged actions or inactions was adverse. They therefore do not state a claim of retaliation.

Plaintiff also complains that, while he was employed as a Food Tech Tutor, he was not paid correctly for his position, based on his educational certificates. Plaintiff complained to Defendants Mack and Burt, neither of whom corrected the alleged problem. Defendant Burt responded to Plaintiff's kite with a reference to a prison policy that Plaintiff believes was inapplicable. Plaintiff alleges that, because he "is aware that inmates who file grievances have been met with retaliation by being transferred to another prison," he was "chilled from filing any further grievances . . . ." (Compl., Page ID#28.)

Plaintiff's claim of retaliation is frivolous. He has alleged no facts from which any reasonable person could conclude that his pay was lower than it should have been because of retaliation for some unidentified protected conduct. Moreover, the fact that Plaintiff believes that MDOC officials have, on unspecified occasions, transferred other inmates on grounds that those inmates believed was retaliatory is wholly insufficient to be considered adverse.

In addition, Plaintiff fails to demonstrate a retaliation claim against any named Defendant based on delays in the delivery and receipt of his mail and books. No Defendant is alleged to have taken any action with respect to his mail or books. Similarly, the fact that an unnamed officer yelled across the visiting room that Plaintiff had legal mail is not adverse. Finally, Plaintiff's complaint that certain prisoners learned about his crime of conviction in no way

demonstrates that any named Defendant revealed that information, much less that the information was revealed in order to retaliate against Plaintiff.

Plaintiff's allegations of retaliation consist of a litany of complaints about the many inconveniences of incarceration, none of which is adverse or remotely sufficient to link any of his protected conduct with any action taken by a named Defendant in this action.

### E.    Supervisory Liability

Plaintiff's only remaining allegations against Defendants Heyns, Palmer, Kipp, Smith, Burt, Winger and Simmons are that they failed to supervise their employees or failed to respond adequately to his complaints and grievances. Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability. *Iqbal*, 556 U.S. at 676; *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). A claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. *Grinter*, 532 F.3d at 575; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. Plaintiff has failed to allege that Defendants Heyns, Palmer, Kipp, Smith, Burt, Winger

-33-

and Simmons engaged in any active unconstitutional behavior.  Accordingly, he fails to state a claim against them.

**<u>Conclusion</u>**

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiff's complaint will be dismissed on grounds of immunity and for failure to state a claim pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).

The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3).  *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997).  For the same reasons that the Court dismisses the action, the Court discerns no good-faith basis for an appeal.  Should Plaintiff appeal this decision, the Court will assess the $505.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis*, e.g., by the "three-strikes" rule of § 1915(g).  If he is barred, he will be required to pay the $505.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

A Judgment consistent with this Opinion will be entered.

Dated:  July 10, 2014                          /s/ Janet T. Neff
                                                Janet T. Neff
                                                United States District Judge